# 12-61499-CIV-ROSENBAUM/SELTZER

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

| | |
|---|---|
| IN THE MATTER OF | ) |
| | ) |
| PROPERTY UNLAWFULLY SEIZED FROM | ) |
| THE OFFICE OF DR. JOHN BENNETT | ) |
| AND EVIDENCE OBTAINED BY THE | )  Civil action No. _____ |
| WRONGFUL SEIZURE OF THE PERSON, | ) |
| DR. JOHN BENNET, SEEKING | ) PETITION TO |
| THE RETURN AND SUPPRESSION | ) RETURN PROPERTY/ |
| OF SAID PROPERTY AND EVIDENCE | ) MEMORANDUM |

### PETTION TO RETURN PROPERTY
### AND VARIOUS ADDITIONAL RELIEF INCLUDING:

### (1) DISCLOSURE OF THE SEARCH WARRANT AFFIDAVIT; AND
### THE PLEADING DEMANDING IT BE SEALED;
### (2) INSPECTION OF AND RETURN OF SEIZED PROPERTY;
### (3) THE SUPPRESSION OF WHAT WAS SEIZED IN THE SEARCH: AND
### (4) THE DISCLOSURE AND SUPPRESSION OF THE COERCED
### CUSTODIAL INTERROGATION OF DR. JOHN BENNETT.

**COMES NOW PETITIONER/MOVANT,** John Bennett, M.D., by and through his undersigned attorney, John P. Flannery II, in accordance with the 1st, 4th, 5th, and the 14th Amendments to the U.S. Constitution, and in reliance on Rule 41 of the Federal Rules of Criminal Procedure,

(first), to move this Honorable Court to unseal the search warrant affidavit and the pleading demanding the affidavit be sealed, as such affidavit was relied upon to authorize a search of the above captioned premises (hereinafter "the Bennett Medical Offices"), and that occurred on April Fool's Day, April 1, 2011,

1

because the representations made by the U.S. Government to a Magistrate in order

to seal said affidavit were false, misleading, and in reckless disregard of the truth,

as there never was any reason to seal the warrant, particularly as to the oft-cited

reason for sealing warrants, danger to the government's undisclosed "witnesses"

or "sources" when, in fact and truth, in this case, according to representations by

the government since the search, the key "witnesses" or "sources" are three (3)

government agents who pretended to have back pain and did, in truth and fact,

evidence back pain, requiring medication prescribed to them, and their identities

are known;

    (second), to move this Honorable Court to return the property seized by the

U.S. Government during the aforesaid search as, on information and belief, the

search was a thinly veiled pretext to conduct a fishing expedition of Dr. Bennett's

Medical Offices, and the government did not ask to seal the affidavit in order to

protect any "witness" or "informant" but rather to stymie efforts by Movant to

scrutinize the government's misrepresentations in obtaining the warrant in the first

place, and attacking the sufficiency of the probable cause asserted to obtain any

search warrant; in the bargain, the government destroyed Dr. Bennett's medical

practice at the clinic; accordingly, Movant invokes this Court's equity powers and

demands access to and the return of his property (the patients' records); and

    (third), to move this Honorable Court to suppress the property that was seized

in the aforesaid search, and to preclude its use as evidence in any proceeding,

before any grand or petit jury, predicated upon the constitutional authority already

referenced, because of the U.S. Government's gross and reckless disregard of the truth, namely, that no crime had been committed here, nor was there probable cause that any had been committed, and the fact that this search was tantamount to a general warrant without any particularity by which the search was or could have been narrowed,

(fourth) to move this Honorable Court to <u>disclose to Movant</u> *in toto* <u>the statements the government coerced during the search and then to suppress them for the manner they were obtained,</u> while Dr. Bennett was held in custody, since the government agents refused to allow him to leave, forcing him to answer their questions first, without any *Miranda* warnings, and over the objection of his counsel, kept outside the building during the search, insisting that no one question his client, Dr. Bennett during the search;

(fifth), to move this Honorable Court further to <u>schedule an evidentiary hearing</u> to allow Movant to prove the facts asserted herein in support of this application; and

(sixth), to move for such <u>additional relief</u> as this Court may deem fit and just including <u>attorney's fees and costs for having to make these motions.</u>

In support of this application, movant sets forth the material facts and a brief discussion of the applicable law, as follows:

## I. STATEMENT OF MATERIAL FACTS

## A. THE CONTEXT FOR THIS HARASSMENT

1.  The Government has conducted a campaign of harassment against Dr. John

Bennett, that became evident on April 1, 2011, on a "fool's day," when the Government purposefully destroyed his medical practice, located at the Gulfstream Pain Center, at 327 E. Hallandale Beach Blvd., Hallandale, FL 33009 [hereinafter, the Gulfstream Pain Clinic], by seizing more than 2,000 patient files, based on the allegations of three undercover agents, pretending to have back pain, that Dr. Bennett rightly treated for their claimed and objectively certifiable pain symptoms with pain medication, properly prescribed.

2.   The Government did what it does, when it is at its worst, and treated Dr. Bennett as if he were a drug kingpin who was moving narcotics, instead of the accomplished physician he is -- treating and healing his patients; Dr. Bennett was restrained and not allowed to leave the Gulfstream Pain Clinic where he attended to his patients; his person was seized and he was interrogated; he was not permitted to go free until he submitted to this interrogation; this occurred even as Dr. Bennett's counsel at the time stood outside of the Clinic, forbidden from entering the facility, insisting that Dr. Bennett not be questioned at all; it is beyond any shadow of doubt, that Dr. Bennett was never advised that he had a right, under *Miranda*, to remain silent; the questioning and the content of the interrogation have not been provided to counsel, despite repeated oral and written requests for same; the Government has insisted that we engage in plea negotiations but withholds the critical information by which we may make any decision about the reliability of the government's representations about the facts justifying any prosecution, and thus what we need to know to consider seriously any plea, and

this in the shadow of the Supreme Court's recent decisions stating, what we all appreciated as a matter of fact even before that decision, that plea discussions are a critical phase in any criminal proceeding; in this context, it would be malpractice and ineffective assistance of counsel to agree to any plea, however generous the government might deign to be (and the proposed offers have not been generous); for how may one compare the critical elements of any possible offense against evidence that the government withholds when the evidence it discloses is insufficient; it is beyond cavil that, without information, no reasonable defense counsel can make a representation on behalf of his client at any colloquy on any plea to an information (or an indictment).

3.  The Government obtained the search warrant (See Exhibit A, attached hereto) we are attacking based on an affidavit that remains sealed and perhaps that's because the U.S. Government made preposterous representations to this Honorable Court, also under seal, that Dr. Bennett posed some "physical threat" to one or more of the government's "confidential informants;"  the reflexive representation in "real" drug cases; of course, we don't see how that can possibly be the basis for sealing the affidavit in this case, not only given the respectful character of Dr. Bennett, but also since the Government has informed us that the sole evidence they gathered to make this search in the first place were several undercover agents who posed as pain patients who, by every indication, really did need the prescribed treatment including the pain medication they received.

4.  While sealing an affidavit may be legitimate when dealing with real drug

kingpins in the kinds of cases that I once handled as a federal drug prosecutor in the Southern District of New York, it is an abuse of power and recklessly misleading when there is truly no danger at all and when – as here - the "subject" of the investigation is a physician treating patients, and the only reason is to keep the subject of the investigation in the dark so the government may ambush him.

5.  As for why the U.S. Government would target Dr. Bennett, it is simple.

6.  The government has targeted physicians nationwide who treat chronic pain patients with Opioids, an approved and effective medical use for Opioids -- as a Schedule II controlled substance.

7.  This treatment by Opioids is a medical practice that the federal government abhors as an "illegitimate" medical practice despite the objections of Physicians[1] and Pharmacists[2] that this governmental heavy handedness has chilled the treatment of chronic non-malignant pain patients nationwide.

8.  The government's wrong-headed policy has disastrous public policy effects as there are 55 million patients who suffer from pain in the United States and, accordingly, there has been massive under-treatment -- as physicians fear their

---

[1] The Federation of State Medical Boards of the United States stated that, even though we have in place "state pain policies recognizing the legitimate uses of opioid analgesics", chronic pain patients "continue to be under-treated" and the principal reason is the "*unnecessary* scrutiny by regulatory authorities" (emphasis supplied). *See* Federation of State Medical Boards of the United States, Inc., *"Model Policy for the Use of Controlled Substances for the Treatment of Pain"* (http://www.fsmb.org/pdf/2004_grpol_Controlled_Substances.pdf).

[2] The American Pharmacists Association told Congress that "Every effort to prevent diversion and abuse has the potential to diminish appropriate prescribing and dispensing *exponentially*" (emphasis supplied) and the risk of this unbridled law enforcement effort is that we "negatively impact care to thousands of patients living in pain who could be helped by appropriate use of controlled substances." *See* Statement of the American Pharmacist Association, *"OxyContin and Beyond: Examining the Role of FDA and DEA in Regulating Prescription Painkillers"*, submitted to the House Government Reform Committee, Subcommittee on Regulatory Affairs (Boston, Mass. - September 13, 2005) (http://www.aphanet.org/AM/Template.cfm?Section=Search&section=Access_to_Drugs&template=/CM/ContentDisplay.cfm&ContentFileID=788 ).

government shall harass them if not prosecute them should they actually treat chronic pain patients.

9. In Florida, there have been scare headlines that prescription drugs cause deaths and have no public health purpose. Given how difficult it is to evaluate the cause of death, death may be a coincidence of prescription medicine when the factors are not carefully isolated. One treatment of this subject by Time observed that patients with chronic pain are often suffering from "chronic, life-threatening diseases such as heart disease and high blood pressure – conditions that can cause death on their own, without drugs." Maia Szalavitz, "Difficulties in Determining a Drug Overdose Death," TIME (June 16, 2010). Dr. Steven Karch, a cardiac pathologist, who writes and testifies on this topic says that in most instances of drug overdose, "the current available medical technology cannot accurately determine whether or which drugs caused death." Id. Complicating the matter is the fact that chronic pain patients have tolerance for opiates (so there is no standard), also there is postmortem redistribution (a shift in the drug levels after death).

10. We have reason to question these scare headlines released by the government about our public health when there are more than ten times as many deaths in Florida supposedly from tobacco (78 deaths a day). And there is every reason to treat those figures as suspect – meaning the facts are likely more complicated, even as to tobacco, than the bare numbers can fairly indicate.

11. Irresponsible public officials throw around the number of tablets prescribed,

7

as if the numbers themselves are outrageous and shocking, ignoring how 4 tablets a day times the days in the month (makes 120 tablets) times the months in a year (makes 1,440 a year) times even a thousand chronic pain patients (makes 1.4 million tablets).   And we have many more than a thousand legitimate acute and chronic pain patients in a population of 18.6 Million "Floridians."  Florida is the 4th most populated state with 3 million residences over 65 years of age.  Nor is pain restricted to our "saged" population.  It affects citizens of all ages.  If there were 50 million tablets dispensed in a year in Florida, at the rate of 4 tablets a day per patient (and some patients require more remediation), that would mean there were about 35,000 pain patients, or less than 2/10 of one percent of the total population.  That's sure not the impression you get from the government's fear machine.

12. There is a calculus by which we may distinguish between a physician who is easing chronic pain and another who is dealing in drugs.

13. We insist that Dr. Bennett is a physician who has attended to patients for his entire professional life and some part of Dr. Bennett's medical practice does necessarily involve easing chronic pain, a condition that is wide spread in the nation, in Florida and particularly in Hallandale where Dr. Bennett made his practice – at least until the government thugs invaded his medical offices on April 1, 2011.

14. What happened to Dr. Bennett was acknowledged by the Supreme Court of the United States when Justice Kennedy, writing for a majority of the Supreme

Court in a 6-3 decision in *Gonzales v. Oregon*, 546 U.S. 243, 126 S. Ct. 904, at 922 (2006), said that the Attorney General has no medical expertise, nor authority over medical standards, and yet the Attorney General persists in the belief that he may set medical standards for the nation.

15. The Department of Justice, under the direction of the Attorney General, including the offices of the U.S. Attorney in Florida, has conducted a campaign against physicians who prescribe opioids for chronic pain with one objective – to criminalize the treatment of patients with opioids no matter how legitimate.  We are not saying that there are no offending physicians – as is true in any profession - but we are saying that this physician, Dr. Bennett, like most physicians, is not among the offending class.

16. The Department has blithely disregarded not only its noteworthy critics but also the critical challenge facing Florida's chronic pain patients who are not terminal cancer patients and who will live long and suffer greatly when they cannot dull their daily unremitting pain.

17. The prosecutor in this case insisted that the only patients who need receive opioids are terminal cancer patients when that is plainly not the standard under the law, even the government's most restrictive reading of the law.  Indeed, the prosecutor in this case thought my dentist maybe should be investigated for prescribing Oxycodone after a root canal.  In other words, the Justice Department measures no more carefully than the bluntest of instruments can what is a truly legitimate medical practice.

18. So that we can appreciate the damage that this Departmental initiative may have, it is a fact that, if a patient's chronic pain is unrelieved, it may lead to suicide, and often does.

19. While a physician's Hippocratic directive may be to do no harm, the government's prosecutions are calculated to accomplish precisely the opposite, and to create the harm that the U.S. Government makes such great pretense to avoid.

20. In other words, this search of Dr. Bennett's medical offices is only the most recent offense in an "enforcement" campaign, by which the federal government intimidates and criminalizes chronic pain medication wherever it can find it – catching the innocent in its broadly dragged net.

21. Physicians are targeted, for instance, based on "red flags" that the State contrives as indicia of "diversion" such as the "number of patients that visit a physician in a day," how long they may visit with the physician, whether the patients pay their bill in whole or part in cash.   These "red flags" are treated as presumptively valid tests of misconduct when they are nothing of the sort – at least not as a matter of statute, logic or sufficient evidence.

22. The State Attorneys General have questioned the validity of such "red flags" that the federal government prefers such as the "number of patients a physician attends to on a day" since "[t]hose physicians who are willing to treat such vulnerable patients are likely to see many because their colleagues are often afraid to do so" – and the public is increasingly growing to appreciate why the doctors

are afraid as they experience pain themselves, or know somehow who has experienced pain.  But let us consider the facts of this case.

**B.  Dr. Bennett**

23. Dr. Bennett has had a distinguished medical career, and treated patients including those who suffer from chronic pain.

**C. The Search**

24. On March 30, 2011, U.S. Magistrate Lurana S. Snow, reviewed an affidavit in support of a search and seizure warrant, and then issued a search and seizure warrant (see Exhibit A) based on the affidavit of an unidentified "federal law enforcement officer" or "an attorney for the government."

25. When we asked the prosecutor for a copy of the supporting affidavit, she claimed that she hadn't seen it, and presumably didn't prepare it (for how else could it remain "unseen"?).

26. The warrant said that the search had to be conducted by April 13, 2011.

27. There is a provision in any warrant to delay notice under Title 18, United States Code Section 2705, but there was no determination that such delay was necessary.

28. Among the reasons for delay, set forth in Section 2705((a)(2) are endangering others, flight, destruction of evidence, intimation of witnesses, and jeopardizing an investigation.  The government apparently cited none of those and yet the search warrant was sealed.

29. In addition, the agents performing the search, with only the warrant being

unsealed had no guidance from the warrant itself as to what they were seeking that came within the ambit of this investigation.

30. The agents had a wide and sweeping laundry list of things to seize so broad in scope as to exclude nothing from seizure, thus making the search a constitutionally impermissible general search – the very offense the Fourth Amendment was drafted to avoid.

31. The U.S. Government Agents conducted a general search that resulted in them carting off 2,648 patient files, 9 boxes of "miscellaneous documents" and 13 bags containing more "patient files and miscellaneous documents."

32. Neither the search nor the description of what was seized were accomplished with anything like the precision that our nation's founders had in mind when, fresh in their minds, were the writs that the British employed to rummage through the private homes before the revolution.

33. The U.S. Government Agents excluded not a single one of Dr. Bennett's patients from the search, and took away each and every one of the patient's examination forms, lab reports, x-rays, urine screens, the certificates for the medications that Dr. Bennett dispensed, and, in addition, the financial and administrative tools and materials necessary to the clinic's practice.

34. The Government agents did what they set out to do. They shut down Dr. Bennett's medical practice. This process has been repeated time and again and is fundamentally unfair – to close off a business, in this case a clinic, on the say so of the government. The search was so general and complete that they deprived Dr.

Bennett of every record that he relied on to care for and to treat his patients at the Gulfstream Pain Clinic. So thereafter they went without treatment, from that day to this, at least by Dr. Bennett.

35. After the search, Dr. Bennett had NO income for months.

36. After the search, Dr. Bennett was denied any access to his own files – although we have repeatedly asked the prosecution for permission to inspect the files.

37. The government has made representations of what was contained in samples of files that they said the agents had extracted – but the government has refused to let us review those records either to confirm or refute the representations that the government has made.

38. A critical threshold in any prosecution of a physician for impermissibly dealing in drugs, rather than healing a patient, is the medical standard by which a physician maintains he had a legitimate purpose in administering pain medication to treat a patient suffering from acute or chronic pain.

39. Since the search occurred in this case, as I've already indicated, the government has wrongly stated, as a matter of medical practice, that the only time that an attending physician may prescribe Oxycontin (or any opiate for that matter) is if and when the patient is a terminal cancer patient. That is not the legitimate medical practice.

40. The inserts for this pain medication, authorized for distribution as medication by the US Congress, plainly state that the medication is for "moderate

to severe pain" without regard to whether the patient is suffering from cancer or terminal – and thus not so restricted a dispensation as the government insists for the purpose of this investigation.

41. Sloan Kettering, NIH and various exceptional practitioners and peer-reviewed publications in the field of pain management "teach" and "practice" pain management including pain medicine in an array of settings in addition to terminal cancer cases.

42. So that's our first threshold, when pain medication may rightly be prescribed.

43. The undercover agents that are the predicates for the search appear to have legitimately needed the pain medication they were administered by Dr. Bennett. On information and belief, these three undercover agents posing as pain patients were the only evidence justifying the search warrant.

44. These three (3) undercover agents received prescriptions for pain medicine for moderate to severe back pain consistent with their MRIs and their own self-reports as to the nature of the pain they claimed to suffer.

45. When considering whether the clinic was screening drug seekers, there is evidence that they did.   Indeed, there were several more undercover agents including "Ryan Mahoney" who presented themselves at the clinic and these agents were turned away by the clinic and denied any treatment at all because they appeared "dirty," as "drug seekers," and not legitimate patients.

46. We have requested that the government disclose the details relating to these several undercover agents who were turned away.  The government prosecutor claimed to know nothing about this, asked for what names we had, said they would think about supplying this information, said this months ago, and we remain divided from any response behind the Justice Departments unfathomable wall of silent indifference to our communications, requests and entreaties (not what my supervisors countenance when I was a federal prosecutor – these many years ago now).

47. As for the three (3) government undercover agents (that we do have information about), they presented to the clinic, each of them, as having back pain and each repeated a similar cause for their suffering – from work injuries.

48. Three quarters of all adults have back pain at some time in their lives.  Five million Americans are partially disabled by back problems, another Two million are so severely disabled they cannot work.  Low Back Pain accounts for 93 million workdays lost every year and costs over $ 5 billion in health care.

49. In other words, back pain is a common credible medical complaint and it's real.  This is the pain that the undercover agents claimed they had.

50. We have managed to get almost complete patient files for all three undercover agents,[3] and each "patient" had an MRI that plainly indicated

---

[3] We have also asked for the critical cover sheets for each of the undercover's bogus patient files but the government has withheld that information that we insist, as it reflects

intervertebral disc extrusions in the lower back that compressed the nerves that ordinarily prompt the back pain – that these "patients" insisted they suffered. Thus there was objective evidence of what these agents said was the cause of their pain.

51. It is true, as a matter of medical evidence, that some persons with similar MRIs may not have pain, with some extrusions, but we didn't have anything like that here because the extrusions were persuasive and each of the undercovers confirmed: (1) that they suffered injuries that could cause pain, (2) had elevated blood pressure suggesting they were suffering from pain, and (3) expressly declared that they had pain that corresponded to the MRI readings; and that's why it was a "legitimate medical practice" for Dr. Bennett to treat each of the undercovers for "moderate to severe pain" with pain medication.

52. Let's consider them more precisely.

53. First, there was Douglas Abrams (his "bogus name"), who presented himself as a patient with relatively high blood pressure, "165 over 108 (his actual reading)," who told working associates at the clinic that he hurt his back at work, that his back was "numb," also "tight," and that, at its most severe, the pain was a "10" (the worst) without pain medication ("w.o meds"), that he repeated this specific pain assessment at least once more, telling assistants at the clinic that it was a "10." When he had an MRI, the readings indicated "disc bulge and

---

Dr. Bennett's medical judgment, is of an exculpatory nature consistent with treating real patients and turning away drug seekers.

dessication" at L2-3, also at L3-4, and L4-5 "with anterior impression on the thecal sac [surrounding the spinal column]." After the medication was prescribed, Mr. Abrams said his pain got better with "running," worse when "sitting" and that his pain was now "5" (on a scale of 0 to 10) without the "meds." He explained that later on he still was not pain free, that it was still "2" with the meds. Toward the conclusion of his treatment, Mr. Abrams said his pain was down to "3" without the meds. So he was appropriately treated and got "better."

54. We would like to compare these facts with what the affidavit in support of the warrant says.

55. Second, we have Corey Smith (his "bogus name"), who also had somewhat elevated blood pressure ("127 over 91," another time higher still bp, "147 over 95"), and he reported he had "nagging" pain, in his lower back, and that it was also sharp, shooting, throbbing, pinching; without "meds," Mr. Smith's pain was a "5," prompted by an accident a few weeks before he visited the clinic, 2-3 weeks earlier he said, so presumably, if we rely on his self-report, the pain got worse with time; Mr. Smith said he wasn't sure exactly how it happened, said he had no medical records, but that he went to All State before, and it was now closed. He added, "I don't sleep that good." "The pain," he said, "was worse in the morning."

56. Bennett thought from Mr. Smith's description that Smith might have a "ruptured disc" and told him so. Bennett thought it could have happened "gradually." Remember Mr. Smith said he had the incident "weeks earlier."

17

Bennett rightly characterized the condition, "they [people in pain] don't feel anything and a week or two later, the pain will come."

57. Despite Smith's self-report, Bennett told Mr. Smith that he couldn't treat him until he'd seen his MRI.

58. When Mr. Smith's MRI was taken, it indicated disc bulge at L1-2, L2-3, and L4-5 with "anterior impression on the thecal sac," as well as bulge and osteophytes at L5-S1.

59. Bennett told Smith, "It's uh.. the lower back.  These last two (2) blue vertebrae [referring to a model in Dr. Bennett's office]."

60. Dr. Bennett said, "The disk, the disk popped out and hits the nerve."

61. Afterwards, Smith said that the meds he was prescribed made him feel better, and that he was a "4" without "meds."

62. Smith was warned, if he was going to other pain clinics at the same time, that the clinic would cooperate with the police to uncover his misconduct as it violated the contract and assurances that he'd given the clinic.

63. We would like to compare the affidavit in support of the search with these facts.

64. Third, and last, we have Tyler Williams (his "bogus name"), who had particularly high blood pressure ("161 over 86"), and Williams reported that he'd had an injury two months earlier that was work related but that he didn't go to the hospital.  He claimed that he presently (when he reported to the clinic), that he had a nagging pain in the lumbar region, but also had pain in his neck, that the pain

was particularly notable in the evening hours, that work made it worse, but he said it was a level of pain of "3" without meds; afterwards, he said it was "4" without meds.

65. Williams said, "like when I'm working.  It's kind of like …at the end of the day … it's like kind of a nagging .. it just kind of started."

66. Williams was told his blood pressure was "really high" and asked if he usually had "high blood pressure."  Williams said he did not.  He was plainly not a reliable self-reporter as to his own health well-being but the tests don't lie.

67. As for the pain, Williams said that the pain was "kind of in my … lower back .. a little bit in my neck … kind of like .. stiffness."  To an impartial observer that would sound like nerve damage.

68. Asked about the nature of his work, he said, "I work at a concrete and uh … it kind of bothers me like .. we have these things called a 'come along' where you push the concrete … like by the end of the day, it's just .. kind of a nagging stiffness."

69. Dr. Bennett asked if it had "worsened ..lately, is that what brings you here?" Williams answered in the affirmative, "Yeah."

70. Bennett asked, "how long have you had this?" Williams answered, "It… probably [was] about 2 months."

71. Asked where it hurt, Williams said, "It's like kind of down here."  Bennett said, "You may have a slipped disc.  Herniated disc."  Williams said, "Okay."

72. Williams probably had the worst MRI report of the three undercovers.

73. The report concluded that Williams had "disc bulge dessication and osteophytes and facet hypertrophy at the level of L4-5." The report continued, "There is a posterior disc <u>herniation</u> and <u>annular tear</u> with anterior impression on the thecal sac and <u>abutment</u> <u>of</u> <u>the</u> <u>left</u> <u>and</u> <u>right</u> <u>L5</u> <u>Nerve</u> <u>roots</u> (underscoring supplied)." In addition, there was "disc bulge and facet hypertrophy at the level of L5-S1." Mr. Williams couldn't make that up; he actually had that physical disability.

74. When Bennett saw Williams' MRI, he said, "What did I tell you yesterday, I thought you had a herniated disc." Williams said, "Yeah, something like that." Actually that was precisely what Bennett told him. Perhaps the government purposefully chose undercovers in bad medical condition. It would be instructive to consider the medical history of these undercovers since this operation.

75. Bennett said, "Okay, yes you do. Yeah, you definitely have a problem. This....this is just... are ... are you familiar with anatomy at all?" Williams said, "No." Bennett said, "Not really?" Accordingly, Bennett explained, "There's a disc between the bones of the back. What happens is ... part of the gel comes out and pokes against one of your nerves here, and that causes the pain .. sometimes it goes down to the leg and sometimes you get numbness in your leg, too." Williams said, "Okay."

76. Bennett explained, "It depends on what part of the nerve it's hitting .. that's definitely causing your pain." Williams said, "Oh."

77. Bennett said, "I kind of thought so yesterday when I talked to you because you said you had it for such a long time, right?"  Williams said, "What's that?"  Bennett said, "How long have you had this pain?"  Williams said, "It's been kind of a nagging thing."  Bennett asked, "For how long?"  Williams said, "I can't … couple of months, I'd say."  Bennett said, "Yeah, usually back pain strains… they don't last for months.  They get better in a week, two weeks."  Williams said, "Okay."

78. Bennett said, "On the muscle but when it's a disc it pokes out there, it doesn't leave.  You know sometimes people try surgery but a lot of times surgery doesn't work.  So they take pain medications.  Now how bad is this pain?  Or just .. it's nagging but it's really not bad like it's you know.  I mean, I can't do anything.  There's all different grades."

79. Lastly, as to this final undercover agent of the three, we would like to compare this sealed affidavit with the facts as we know them.

80. Of course there's more to say about all three of our undercover "actors" but it appears that they have real problems in their "real" lives, and are not just pretending, and Dr. Bennett gave diagnoses that fit their condition.

81. Any affidavit in support of a search warrant that said otherwise would be false or misleading.

82. Returning to the search, the local counsel referenced above, Bernard Cassidy, Esq., has stated that during the search he directed the agents not to talk to Dr. Bennett who was inside the clinic but Dr. Bennett was questioned anyhow.

83. As we have already indicated, Dr. Bennett was told he was not free to leave, thus his person was "seized" in a constitutional manner, and a statement was taken without advising him that he could remain silent.

84. Dr. Bennett was most certainly not told what Mr. Cassidy, his counsel, said to the government agents outside the clinic – asking the agents to inform Dr. Bennett to remain silent – as was his right.

85. We have not been able to obtain a copy of Dr. Bennett's statement(s) and any claimed waivers (although we believe there are none) that Dr. Bennett may have signed.

86. As for the files that were seized, during our conversation, the government has said out of the thousands of files that were seized, leaving not one patient file behind, the government agents selected a sample of patient files and, *inter alia*, reviewed the urinalysis results for each of these patients, and that these patients failed to show opiates that were prescribed.  We have asked to review these files for ourselves – as the government's assertion makes no sense to us -- and have been denied access by the government even to these "sample" files.

**D.  The Aftermath – the process following the search.**

87. Following the search, the government has refused Dr. Bennett's request to return or to access his files and the office materials -- so that Dr. Bennett may prepare his defense to charges being bandied about regarding Dr. Bennett's medical practice.

88. We have made the more narrow request, to review the files – if the

government won't return them.  The prosecutor said she'd get back to us.  She has
not.

89. The government has invited us to discuss the settlement of this case.  We
have said we are willing to consider facts that justify any settlement but the
government has refused us the opportunity to look at the patient files so that we
may evaluate the government's assertions.  In more recent conversations, the
prosecutor on the case asked for what records undersigned counsel had, claiming
she did not have from the case agent the documents that we had, and yet she was
bargaining for a plea, without – apparently – having consider the facts fully and
fairly herself.

**E. The nature of chronic pain – often neuropathic and seemingly subjective.**

90. It must be appreciated that chronic pain patients often have to describe their
pain -- as there is no other way for a physician to detect or confirm the nature,
origin and intensity of the pain a chronic pain patient suffers.

91. The pain often cannot be detected by an X-ray, CAT-scan, or MRI,
particularly, for example, when the source of the pain is neuropathic (reflecting
either damage to or a disease of the nerves themselves); but in this case, we had
corresponding physical changes that could affect the nervous system and cause the
pain alleged, and that were observable on MRIs.

92. The prosecution ordinarily bases its notion of what a doctor should do on an
over-reliance on structural imaging studies such as MRI and CAT-scans to
confirm a physical phenomenon that would seem to be the origin of the chronic

pain.  But here that was done, MRIs were taken, and indicated there were such changes.

93.  Unfortunately, structural imaging studies cannot, however, provide any information on the biochemical mediators causing soft tissue pain.  The presence of a structural defect cannot predict pain and neither can the absence of a structural defect predict pain.[4]

94. In the government's analysis, persons with severe pain such as Fibromyalgia, to chose one example, who do not have any structural abnormalities, will be labeled as malingerers and drug seekers and should, according to the government's policy perspective, be sent for urgent psychiatric counseling, rather than treated for their chronic pain.

95. If we have acute pain and, for whatever reason, the body doesn't control that pain, it may invade the central nervous system through a process that is called central sensitization.  When this happens, the central nervous system becomes the pain generator, and the disease spreads within it through a process called neuroplasticity.

96. E. Andrew Ochroch, M.D., a Professor in the Department of Anesthesiology at the University of Pennsylvania wrote an article preferring the use of preemptive analgesia for pain and recovery to avoid this sensitization:

---

[4] A landmark study has shown that one-third of perfectly healthy persons who have no pain will have a herniated disk present on an MRI scan.  Should any of these persons have a slip and fall injury and present themselves to the Emergency Room, the disk will be blamed for the pain and they have a high probability of getting unneeded surgery.

"In a process known as central sensitization, painful stimuli can increase the sensitivity to pain of nerves in the spinal chord, alter ascending and descending pain transmission pathways in the spinal cord, and change neuronal thresholds and neurotransmitter activity in the brain. Central sensitization can result in stimuli that were not previously painful being regarded as painful (allodynia) and sensitization provided the neurobiological basis for the clinical experience that some patients suffer from surgical pain long after normal tissue has occurred (footnotes omitted)."

97. The prosecution's standard for enforcement is, nevertheless, that a physician may not prescribe pain medicine, when all other methods fail, based exclusively on a subjective complaint of pain, unless it is accompanied by some observable physical phenomenon that might correspond to the complaint of chronic pain.

98. In other words, the government doesn't get it, or – worse - chooses not to get it.

99. From such willful ignorance and arrogance generally, and as applied in this case, does the government's campaign against chronic pain medicine proceed.

100. In this same regard, the government also presumes that the coincidence of a patient dying when treated by a physician is a consequence of the pain prescriptions that the doctor provides. In this case, there has been no death alleged, coincidental or causal, as we have been limited to the three (3) undercover agents pretending to have back pain corresponding to their actual (not bogus) symptoms.

101. If it weren't for the pain medication that many chronic pain patients have, many more would commit suicide, not fewer.

**F. The Aftermath – the bought and paid experts the government relies on**

**before and after its searches in its war against pain medication including legitimate medication.**

102. The government enlists bought and paid experts, often out of state, who are "regulars" in the government's war against pain physicians.

103. They are "hired guns", engaged to sift through the files seized from Dr. Bennett, in this case, to find, after the fact of the general search, "something" that enables the government to hang its prosecutorial hat on; these experts sometimes render opinions used in the affidavit in support of the search warrant; as we haven't seen the affidavit we are not in a position to comment on the abusive use of experts in connection with this particular search but the bottom line is, like the prosecution, they deny any level of pain medication is appropriate.

104. These "experts" often have no real experience – as practitioners – in dealing with pain, either acute or chronic, but rather they are board-certified as to addiction, addictionologists, and are opiate-averse, afraid of a patient's dependency, unconcerned about relieving their pain, willing to allow patients to suffer in pain for the fear that they may become addicted – even absent any indication that the patients are inclined to become addicted.

105. Thus, these "experts" have little or <u>no</u> clinical experience attending to chronic pain patients, and may very well have provided no long term prescriptions, particularly of opioids, to any patient in their medical careers; yet that is who the government "selects" to "screen," in this case, Dr. Bennett's patient records that

the government seized, in order to "cherry pick" those that the government's

expert may, in his inexpert "opinion" (as to pain medication), deem Dr. Bennett's

practice to be "outside of the bounds of professional medical practice."

106. These experts also do not meet with any of the patients, whose files they

examine, before rendering a uniformly adverse opinion as to the practice of the

doctors in question – and that is why these experts are selected by the government

in the first place.

**G.  The representations made to this Court, under seal, to obtain the search
warrant – on information and belief.**

107. As the government has sought to seal the affidavit in support of the search

warrant, in order to thwart the kind of scrutiny, plainly contemplated by the Fourth

and Fifth Amendments to the U.S. Constitution, Movant suffers the obvious

disadvantage in challenging the contents and sufficiency of that sealed affidavit.

108. Accordingly, Movant respectfully requests that, when the Court unseals the

affidavit, as we have requested herein, that the Court grant Movant an opportunity

to amend the instant motion to reflect, with precision, the additional constitutional

defects that were extant when that affidavit was wrongly presented to the Court, so

that Movant may fully and fairly inform this Court's discretion - as to the

governmental misconduct that compromised Dr. Bennett's constitutional and

statutory rights.

109. Otherwise, insofar as Movant can instruct this Court to the extent and

nature of the government's reckless representations to the Court, we suggest the

following elements of the affidavit that, we believe, are instructive as to the nature of the government's misconduct and misleading misrepresentations.

110. First, on information and belief, based on conversations with the prosecutor in this case, the entire basis of "probable cause" for the warrant consisted of the three undercover agents that we have discussed above who were rightly and legitimately treated for what ailed them (back pain) and thus what they have to say, alleging misconduct, is false and misleading and fails to articulate probable cause for any search of the Gulfstream Pain Clinic.

111. Second, there are no other witnesses if what the government has told us is true.

## I. ARGUMENT

### A.  THERE WAS NO BASIS TO SEAL THE AFFIDAVIT IN SUPPORT OF THIS SEARCH WARRANT.

Fundamental due process is at risk whenever the government submits its "secret" evidence under seal to any judicial officer -- without any opportunity for the aggrieved party to dispute what the government had to say.

As of this writing, we have just such a circumstances, some sealed charge, filed *ex parte* with a judicial officer, withholding from Movant the basis for not seeing whether the government had probable cause to conduct any search, as compared to the general search they did conduct.

We believe that the underlying affidavit cannot stand the requisite scrutiny that due process guarantees and has thus been disregarded in this case.  *Compare United States v. Wind*, 527 F.2d 672 (6th Cir.1975).

Movant has had no opportunity to dispute the contents of this star chamber proceeding or to obtain access to his records.   Thus we demand access to this affidavit.

**B.   DR. BENNETT HAS A RIGHT TO REVIEW THE QUESTIONABLE AFFIDAVIT FILED IN SUPPORT OF THE SEARCH WARRANT; DR. BENNETT REQUESTS THAT THE WARRANT BE UNSEALED AS WELL AS THE PLEADINGS THE GOVERNMENT FILED REQUESTING THAT THE AFFIDAVIT BE SEALED, AND CONTINUE TO BE SEALED.**

In the Matter of *Up North Plastics, Inc.*, 940 F/Supp 229 (D. Minn 1996), a business that was the subject of a federal grand jury investigation of anti-trust violations requested that the affidavit supporting a search warrant be unsealed; in response, the government insisted that the affidavit continue to be sealed another nine months.

The court in *Up North* acknowledged the Movants' First Amendment constitutional right of public access to court proceedings and records.  *See, e.g., Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735 (1980); *Nixon v. Warner Communications*, 435 U.S. 589, 98 S.Ct.1306 (1978).

The Court said the government had to explain specifically "why less restrictive alternatives [than sealing] are not appropriate." *Id.*

For the purpose of this exercise, given the chasm between the apparent probable cause assertions and the evidential shortfall, we must take notice that the government does impermissibly conduct "wrong-door raids" with "phantom informants." See Dennis Fitzgerald, "Wrong-Door Raids, Phantom Informants, and the Controlled Buy," Vol 33 The NACDL Champion, at pp.36-43 (Nov. 2009).

One Customs Agent admitted, "I'm not saying we willfully violate peoples' rights. It is just that you get caught up in a whirlwind where the only thing that is important is to make seizures and you end up cutting corners." *Id,* at p.32.

We are concerned, indeed convinced, that corners were cut and rights curtailed in this questionable search and seizure of the property and person of Dr. Bennett.

In *Up North*, the court held "a person whose property has been seized pursuant to a search warrant has a right under the warrant clause of the Fourth Amendment to inspect and copy the affidavit upon which the warrant was issued," citing *In re Search Warrants Issued August 23, 1994*, 889 F. Supp. 296, 298-299, 301 (S.D. Ohio 1995). *See also Sloan v. Sprouse*, 968 P.2d 1254     (OKLA Crim. App 1998) (granting mandamus relief and ordering the lower court to grant the searched party pre-charge access to the government's supporting search warrant, thus finding a Fourth Amendment right to examine the affidavit).

Another reason the Court in *Up North* cited was that, in order for the Court to consider a motion to return property, "the court's decision will almost always

depend upon whether the affidavit submitted in support of the warrant application established probable cause to believe that evidence of a crime would be found in the place to be searched." *Id.*

The court concluded, "The affidavit must be seen to be effectively challenged" and thus "the government must make a specific factual showing of how its investigation will be compromised by the release of the affidavit to the person whose property was seized."

## C. THERE WAS NO PROBABLE CAUSE FOR THE SEARCH

As described above, if as represented by the government, that the only "probable cause" for this search were the three (3) undercovers who were treated by Dr. Bennett correctly, then there is no probable cause for the search.

But that is why we seek to review the search warrant – and should not be left to fight phantoms in sealed documents but rather should be able to scrutinize what the government would withhold from us – the affidavit in support of the warrant, and the government pleading requesting that the affidavit be sealed.

## D. THE WARRANT WAS A GENERAL WARRANT

Search warrants must be supported by sworn testimony, either a sworn written affidavit or oral testimony under oath.   See. U.S. Constitution, Fourth Amendment. The Fourth Amendment requires that a warrant be issued "upon probable cause, supported by Oath or affirmation."

Under Fed. R. Crim. P. 41(d)(1), "[A]fter receiving an affidavit or other information, a magistrate judge... must issue the warrant if there is probable cause to search for and seize a person or property..."

The Fourth Amendment requires that a search warrant "particularly describe the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

In *Marron v. United States*, 275 U.S. 192, 196 (1927), the U.S. Supreme Court held that the Fourth Amendment "particularity" requirement makes "general searches under [a warrant] impossible and prevents the seizure of one thing under a warrant describing another."

Furthermore, the Fourth Amendment "particularity" requirement commands that "nothing is left to the discretion of the officer executing the warrant" and only the items listed for seizure in the warrant may actually be seized. Id.

The Fourth Amendment's "particularity" requirement thus prohibits general warrants. *Marron, supra* 275 U.S. at 196.

A "general warrant" authorizes a "general exploratory rummaging through a person's belongings," and this is strictly prohibited by the Fourth Amendment's "particularity requirement." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). It is hornbook Law that any search conducted under a general warrant is unconstitutional. *Groh v. Ramirez*, 540 U.S. 551, 559 (2004).

The immediate evils that motivated the framing and adoption of the Fourth

Amendment were such indiscriminate searches and seizures under the authority of

"general warrants.". *Payton v. New York*, 445 U.S. 573, 583 (1980). Accordingly

the Fourth Amendment "is to be liberally construed and all owe the duty of

vigilance for its effective enforcement, lest there shall be impairment of the rights

for the protection of which it was adopted." *Go-Bart Importing Co. v. United*

*States*, 282 U.S. 344, 357, 51 S.Ct. 153 (1931).

The Fourth Amendment was crafted with a particular focus on eliminating

the use of general warrants, in response to the British Crown's use of general

"writs of assistance" under which they were authorized to search anywhere they

chose for anything they could find that would be considered a violation of British

tax laws. *Stanford v. Texas*, 379 U.S. 476 (1965); *see also, Boyd v. United States*,

116 U.S. 616, 630 - 31 (1886) (quoting *Entick v. Carrington*, 19 How. St. Tr.

1029, 1066 (1765) (holding that the British Crown's use of general warrants to

seize personal property and papers was illegal and "subversive of all the comforts

of society")).

General warrants are invalid because they vest the executing officer with

"unbridled discretion to conduct an exploratory rummaging through [the

defendant's] papers in search of criminal evidence." *United States v. Yusuf*, 461 F.

3d 374, at 393 n.19. Unfortunately, that's what we had here – "unbridled

discretion."

In addition, even if a warrant does not constitute a "general warrant," it is still unconstitutionally overbroad if it "describes in both specific and inclusive general terms what is to be seized, but authorizes the seizure of items as to which there is no probable cause." *United States v. Yusuf*, 461 F, 3d 374, 393 (3d Cir. 2006). The Warrant in this case works its mischief in various ways.

In *Stanford*, the Supreme Court struck down a warrant for being a general warrant which authorized a search for "evidence of books, records,pamphlets, cards, lists, memoranda, pictures, recordings, and other written instruments concerning the Communist Party of Texas." 379 U.S. 476 (1965)

The search warrant in this case (see Exhibit A) was facially invalid and violated the Fourth Amendment's "particularity" requirement for failing to assert the alleged crime with any understandable "particularity" that would inform an agent's discretion as to the scope of his license to seize items.

In "Exhibit A," we find the only reference to the criminal code, namely Sections 841 and 846 of Title 21, United States Code. As a former federal drug prosecutor (from the Southern District of New York), these are the section we would invoke for street crimes involving exactly what the code provides for, how it is unlawful to "manufacture, distribute, or possess with intent ... a controlled substance." See 21, USC, Section 841. But it is not unlawful for a physician to possess or distribute (directly or by prescription) certain scheduled controlled substances for medical conditions within the contemplation of the congressional authorization that legislated such uses were lawful.

So, by what manner does an investigating agent know to seize only what is unlawful when the agent's only guidance is a section that makes no such distinction.  Nor is there a list of patients or types of records relating to identifiable patients.

The warrant, as written, as it existed in the hands of a searching agent, presented no "particulars" by which any agent could discriminate between records for lawful legitimate patient prescriptions and any patient or prescriptions that might be considered unlawful.

The instinct to defend the search is that there was "probable cause" for the search but there was not.  Three undercover agents who themselves presented symptoms and MRIs that justified prescription reveal nothing inappropriate about the more than 2,000 other patients who also visited this clinic.

No investigative officers knew how to associate any item they were considering to seize with the "corresponding" crime that might thereby be demonstrated; nor, we insist, did they care to try.

Without a clear delineation of the offense or crime on the face of the warrant that could instruct the Agent's discretion, the Agents executing the warrant were vested with unbridled discretion to conduct an exploratory rummaging through Dr. Bennett's medical records in search of evidence of an ambiguous offense not plainly specified.  Compare *United States v. Yusuf*, 461 F.3d 374, 393 n. 19 (3d Cir.2006); *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022 (1971).

35

Patient records, in and of themselves, are not contraband or otherwise known to be unlawful; indeed the opposite is the normal expectation; yet every file in Dr. Bennett's office was seized.

The courts have recognized the potential detriment to an individual's Fourth Amendment rights when a search warrant fails to specify a crime as here. *See, e.g., Myers v. Med. Ctr. of DE, Inc.*, 86 F. Supp. 2d 389, 399 (D. Del. 2000).

In *Myers*, the court held that the affidavit of probable cause did not support a search warrant, in part, because it did not sufficiently specify on its face the crime that had allegedly been committed.

The District Court for the Eastern District of Pennsylvania found that where the warrant for an investigation of a fleet shipping company for illegal overboard waste discharge contained search terms for the officer to search the defendant's computers in a forensic analysis of the computer hard drives, and while the search terms were "primarily geared toward obtaining information about overboard discharges of waste," the terms "[did] not derive that focus from the general warrant, which contained] no reference to overboard discharges." *United States v. Fleet Mgmt, Ltd.*, 521 F. Supp. 2d 436, 443 (E.D. Pa. 2007). This warrant makes no reference to unlawful prescriptions or how that could be ascertained for seizure as to the object offense.

That's why we ask how the government was able to distinguish one patient file from another to conclude that one or other of any of the seized patient files were or could be related to any alleged criminal offense.

This "indiscriminate" method of seizing everything argues that the agents were purposefully "fishing," knowingly seizing every patient's file and every piece of paper or digital medium they could put their hands on without probable cause hoping to establish "after the fact" that one or other of these patients was a "drug seeker" rather than a patient or that they might unearth some other offense not known before and certainly not known at the time of the search.

In *Fleet Mgmt.*, the failure to assert the crime charged in the warrant allowed "the executing officers . . . total discretion in the search, making their own determinations as to what they would seize from the hard drives, without any actual judicial control." Id.  That is remarkably similar to what we have here. *See also United States v. Kow*, 58 F.3d 423, 437 (9th Cir. 1995) (holding warrant lacked sufficient particularity when it did not specify the suspected crimes).

Here, like *Stanford*, the warrant authorizing the original search of the Clinic offices was a general warrant and as such invalid.

If you review "Attachment B" of the warrant (Exhibit A), you will note that the warrant  authorizes a search without limitation for all "records regarding the acquisition, prescribing, dispensing and inventory of controlled substances" although these controlled substances are authorized for distribution in the case of prescriptions.

While the warrant, in "Attachment B," calls for the "controlled substances" and the "fruits, evidence and instrumentalities" of crimes in violation of Title 21 USC Sections 841 and 846, there is no way any agent who was searching could

discern one file from another and there is every reason to suspect that, if they had the affidavit for the search warrant, no patients, other than the undercovers, were identified to narrow the general warrant.

Unlike the ordinary drug case, "controlled substances" are not in and of themselves "contraband" and the possession of these "controlled substances" and the prescriptions and related records are not evidence of anything – as these substances may properly be dispensed.

The items to be seized in "Attachement B" also included "handwritten and computer generated" records of all manner of information not demonstrated to have anything to do with "unlawful" prescriptions, thus inviting ever more rummaging, rather than discernment.

The warrant allowed the officers to inspect and seize any "locked containers" believed to contain a list of materials not necessarily related to or evidence of any unlawful activity.

Since the warrants here were general warrants, all evidence obtained under the warrant would ordinarily compel suppression as a matter of law. *Yusuf*, 461 F.3d at 393 n. 19 (holding that "the only remedy for a general warrant is to suppress all evidence obtained thereby").

In this case, the remedy we seek at this time is the return of what was unlawfully taken, held way too long already, and to suppress the use of this evidence in any going investigation.

## E. RULE 41(g) SUPPORTS DR. BENNETT'S DEMAND THAT HIS PROPERTY BE RETURNED

Rule 41(g) contemplates that an aggrieved party may make a motion when there has been "an unlawful search and seizure" or there has been a "deprivation of property."

Dr. Bennett is "aggrieved" both because: (1) he has been deprived of his property, and (2) there has been an unlawful search and seizure.

Rule 41(g) is often invoked to return seized property <u>after</u> an indictment has been issued. *Black Hills Institute v. Dept. of Justice*, 967 F.2d 1237, 1239 (8th Cir.1992).

But district courts have the express authority, by Rule 41(g), to return property seized by the government even when there has been <u>no</u> criminal proceedings – as here. *United States v. Martinson*, 809 F.2d 1364, 1366-67 (9th Cir.1987).

This has become all the more important since the recent Supreme Court cases in March 2012 held that plea negotiations are a critical phase in criminal proceedings and counsel for the defense can hardly render effective assistance of counsel, to "settle a case," as that's what happens in most criminal cases, if counsel can't properly advise his client as to what evidence there is that confirms the government's assertions as to blameworthiness, that is, whether the facts support the charge of illegitimate medical practice (or not); in addition, we would expect, and did request, the statements that the government asserts Dr. Bennett

allegedly made at the time of the search when his person was seized over his counsel's objection.   Compare *Lafler v. Cooper,* ___ U.S. ___, 132 S. Ct. 1376 (Decided: March 21, 2012); also, *Missouri v. Frye,* ___ U.S. ___, 132 S.Ct. 1399 (Decided: March 21, 2012).

In any case, it is not fundamentally fair or reasonable to expect a settlement while the government withholds the critical information about the true state of affairs that must necessarily inform the decision to make any settlement.

A motion to return property, filed in the absence of any criminal proceeding, is treated as a civil equitable proceeding. *Kitty's East v. United States,* 905 F.2d 1367, 1370 (10th Cir.1990).

Rule 41(g) states, in relevant part, that:

> *A person aggrieved by an unlawful search and seizure or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.*

In *Richey v. Smith,* 515 F.2d 1239 (5th Cir.1975), the Fifth Circuit listed four factors that a district court may consider when deciding whether to grant a Rule 41(e) motion made before there is any criminal proceeding:

1) whether the Government displayed a callous disregard for the constitutional rights of the movant;

2) whether the movant has an individual interest in and need for the property he wants returned;

3) whether the movant would be irreparably injured by denying return of the property; and

4) whether the movant has an adequate remedy at law for the redress of his grievance. *Id.* at 1243-44. *See also Kiesel Company, Inc. v. Householder*, 879 F.2d 385, 387 (8th Cir.1989) (movant must establish callous disregard of the Fourth Amendment, irreparable injury if relief is not granted, and lack of an adequate remedy at law); *Kitty's East*, 905 F.2d at 1370-71 (movant must establish irreparable injury if he is deprived of his property and lack of an adequate remedy at law).

We insist that all four *Richey* factors have been satisfied in this case:

First, the government has shown a callous disregard for Dr. Bennett's constitutional rights – as whatever demonstration they made to get the warrant was wanting, and, absent guidance as to what was relevant, the government proceeded to seize everything in sight including the person of Dr. Bennett.

Second, nor is there any question that Dr. Bennett has established an individual interest in and need for the property seized.  This interest derives from the fact that the documents – the patient files – are Dr. Bennett's property under Florida law, and that they are necessary for Dr. Bennett to defend himself against the questionable tactics and assumptions that the government has invoked in this "investigation" to date.  Nor can the government articulate any reason for withholding all the documents it seized, and, more than that, for denying access to inspect what was and remains Dr. Bennett's property.  While the government said

it would consider our request to access in a conversation now months ago, it has since ignored repeated calls and correspondence, failing to write or call back.

Third, while it is not clear that the Eleventh Circuit requires a finding of irreparable injury, but, assuming *arguendo*, it is a prerequisite, it is satisfied in this case.   Dr. Bennett requires the papers, charts, x-rays, computers and other materials for the reasons indicated.  In addition, when it comes to irreparable injury, as specifically noted in *Richey*, "a wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted. The stigma cannot be easily erased."  *Richey*, 515 F.2d at 1243 n. 10.

Fourth, and this must be self-evident, there is no adequate remedy at law. The government has documents that it won't return or even permit Dr. Bennett to inspect or copy, won't even discuss over the phone, and that is to keep Dr. Bennett in the dark while they cherry pick information they'll use in one of the government's classical "drive by" ambush prosecutions – requiring Movant to chase after the omitted material facts and documents that the government has not deemed worthy of mention or to make available for Dr. Bennett's inspection – because it undercuts their selective "thesis" of the prosecution.

Even if this Honorable Court did not find each and every one of the *Richey* elements, Movant Bennett insists that this Court may properly find that the balance of equities favors the Court reaching the merits of Dr. Bennett's Rule 41(g) claim, and thus do we most respectfully request that this Court invoke its equitable jurisdiction and direct that Dr. Bennett's property be returned.

In addition, another apt remedy we seek, under the equitable considerations that prevail, is an order requiring the government not only to return what it seized but also to require the government to destroy all copies of records it has seized.

There is authority, where equitable considerations justify the result, to require the government to return or destroy all copies of records it has seized. *Cf. Paton v. LaPrade*, 524 F.2d 862, 867-69 (3rd Cir.1975)(civil rights action that did not involve Rule 41(g)). This is such a case.

But, even if the Court does not direct that the government destroy its copies, by the express terms of Rule 41(g), this Court may, if it grants the instant motion, "impose reasonable conditions to protect access to the property and its use in later proceedings."

While the government might insist that it needed the property for its investigation or prosecution, an assertion we heartily dispute, the government's "legitimate interests" may be satisfied even as the property is returned. An adequate resolution of any arguable need that the government may have, if the Court is not persuaded by our related requests, is for the government to copy the documents and, on information and belief, they already have – as we have the select files of the three (3) undercover agents (although not all those documents either). In any case, we can arrange less intrusive ways of access and preservation than have prevailed to date.

If the Court denies all these remedies, then, at the least, the Court, we

respectfully insist, should permit, Dr. Bennett access to the files so that Dr.

Bennett may review these materials with his counsel.

### F. WITHHOLDING DR. BENNET'S PROPERTY FOR FIFTEEN MONTHS IS, WITHOUT ANY CHARGE, IN AND OF ITSELF, A DENIAL OF CONSTITUTIONAL DUE PROCESS AND, ON BALANCE, MANDATES THE RETURN OF DR. BENNETT'S PROPERTY.

Rule 41(g) requires that a federal district court balance the interests of the

parties to determine the reasonableness of the government's retention of seized

property. Compare *Unites States v. Lamplugh*, 956 F. Supp. 1204, 1206 (M.D.PA.

1997).

A Rule 41(g) motion is properly brought to recover property when the

government holds the property for an unreasonable length of time without the

institution of proceedings. *United States v. Sims*, 376 F.3d 705, 708 (7th Cir.

2004).

The test to determine whether property should be returned is whether the

government's retention of the property is reasonable. *In re: Search of the Office of

Ken Tylman*, 245 F.3d 978, 980 (7th Cir. 2001). In this case, we argue this is an

easier question given how unreasonable was the seizure.

According to the 1989 Advisory Committee Notes to Federal Rules of

CriminalProcedure 41, in the ordinary case, if the United States can show a need

to retain the property for their investigation, then their need is probably

reasonable; however, if the government's legitimate interest can be satisfied even

with the return of the property the continued retention becomes unreasonable.
Putting aside for the moment how unreasonable was the search, there are
alternatives to seizure that can satisfy any "legitimate interest" the government
may claim.

The Advisory Committee explained the nature of "accommodation" that
should apply to protect the property rights of the property owners:

"As amended, Rule [41(g)] avoids an all or nothing approach whereby the
government must either return records and make no copies or keep originals
notwithstanding the hardship to their owner.  The amended rule recognizes that
reasonable accommodations might protect both the law enforcement interests of
the United States and the property rights of property owners and holders.  In many
instances documents and records that are relevant to ongoing or contemplated
investigations and prosecutions may be returned to their owner as long as the
government preserves a copy for future use.  1989 Advisory Committee Notes to
Fed. R. Crim. P. 41.

In *United States v. Lamplugh*, Alcohol, Tobacco and Firearms agents and
IRS agents seized a substantial amount of cash, among other property, during the
execution of a search warrant.  956 F. Supp. at 1205.

The defendants moved for the return of the currency pursuant to Fed. R.
Crim. P. 41(e)(before the revision, 41(g) was Rule 41(e)).  The court had held that
the government failed to show any continuing interest in the currency that could
not be safeguarded by alternative means: "Although the government contends that

45

the currency will be evidence in its tax evasion case, it is difficult to understand

how their interest would not be equally served by photographing the evidence

and recording serial numbers." *Id.* at 1207-08; *See also, United States v. Premises*

*Known as 608 Taylor Ave.*, 584 F.2d 1297, 1304 (3d Cir. 1978) (if the

Government's sole interest in retaining currency is as evidence, the court should

consider whether this purpose would be equally well served by alternatives to

holding the money itself).

Similarly, in *United States v. Frank*, 763 F.2d 551,552(3d Cir. 1985), the

Court said that the IRS could not keep Movant's money without a need or

justification.

Property held solely as evidence shall be returned if the government has

unreasonably delayed in bringing a prosecution of some other dispositive action.

608 Taylor Ave., 584 F.2d at 1302.

Even with a continuing investigation, the government cannot simply hold

property without taking some action. *United States v. Carter*, 859 F. Supp. 202,

205 (E.D. Va. 1994).

Furthermore, the government's failure to commence timely proceedings after

seizure of property violates the Constitution if the delay takes unreasonable

proportions. *Shea v. Gabriel*, 520 F.2d 879, 882 (1st Cir. 1975).

In *United States v. Lamplugh*, the Court decided that the government's

retention of currency for nearly three years was unreasonable. 956 F. Supp. at

1207; *See also, Mr. Lucky Messenger Serv., Inc. v. United States*, 587 F.2d 15 (7th

Cir. 1978) (if no charges are filed for nearly one and one-half years after the property was seized, constitutional violations emerge which, on equitable principles, mandate the return of the property).

As stated in both *Mr. Lucky Messenger Service* and *Shea v. Gabriel*, untimely delays by the government in bringing some dispositive action begins to cross Constitutional thresholds that Courts simply cannot afford to tolerate.

In *Barker v. Wirgo,* 407 US 514, 92 S.Ct. 2182 (1972), the Supreme Court set out a balancing inquiry, in the case of a speedy trial claim, to determine whether the delay violated the due process right to be heard in a meaningful time frame. The *Barker* test required the Court to consider the length of the delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant. *Id.*

This test has since *Barker* been applied when considering the seizure of property. *Compare United States v. Von Neumann,* 474 US 242, 106 S.Ct. 610 (1986)

In *Von Neuman,* the movant filed for the return of his car and disputed the delay of 36 days to recover his vehicle. At issue was the promptness of a hearing and recovery; the vehicle was recovered two weeks after he posted bond.

It is hard to understand why a seized item that is not needed as evidence should not be released, if necessary, with some protective orders.

In *Smith v. City of Chicago,* 524 F.3d 834 (7th Cir. 2008), *rehg. denied, cert. granted in part by, Alvarez v. Smith,* 555 US 1169, 129 S.Ct. 1401 (Feb. 23, 2009),

*argued* (Oct. 14, 2009), the 7th Circuit Court found constitutionally defective a state's seizure protocol for property 'believed" to be involved in certain crimes held when the property was without a prompt, post-seizure probable cause hearing, indeed, for a period as long as 187 days.

In *United States v. $8,850,* 461 US 555, at 562-63 103 S.Ct. 2005 (1983), the Court held a post-seizure hearing was required and the Court characterized the issue of delay as "when a post seizure delay may become so prolonged that the dispossessed property owner has been deprived of a meaningful hearing at a meaningful time."

This seizure is comparable and, but for this motion, Dr. Bennett's property would continue to be held indefinitely without any assertion by the government of any charged predicate, nor disclosure of the probable cause purportedly justifying the seizure.

By the standards enunciated in *Barker*, the delay is extraordinary, indeed there is no reason for this delay except to deny Dr. Bennett dominion and control over his own property or to frustrate his ability to examine the material in his own defense.

Dr. Bennett, as of this moment, has asserted his right to the property and, as he has not been charged with any crime, nor had disclosed what the government told the magistrate might be his offense, his right to recover is superior to an Accused's right. The prejudice to Dr. Bennett is manifest, to take his property,

wood shed him, and refuse to let him have any access to his property or disclose what they believe he said when he was seized.

In the case at hand, Dr. Bennett asks the return of his property and the disclosure of his statement. The government can as easily photograph the records it seized, and there is no prejudice to the government when disclosing what they say Dr. Bennett said.

## G. DR. BENNETT REQUESTS THAT THE EVIDENTIARY HEARING, WHEN HELD, ENCOMPASS THE *FRANKS V. DELAWARE* VIOLATIONS AS WELL.

The validity of a search warrant depends on the sufficiency of the underlying affidavit. *United States v. Martinez*, 588 F.2d 1227, 1234 (9th Cir. 1978).

Where the affidavit contains intentionally or recklessly false statements, the affidavit must be purged of its falsities and still be sufficient to support a finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

As the underlying sealed affidavit apparently asserted that the three undercovers were treated when there was no need to do so, despite the fact that based on their MRIs and the representations they made, they did need to be treated; thus, such statements as they needed no treatment were false, misleading and, at best, recklessly made.

As no distinction was made as to why it was appropriate to seize any and all patient records, there is further compelling *indicia* of recklessness and even misconduct.

## H.  THE INTERROGATION HAD MUST BE PRODUCED AND SUPPRESSED.

We are moving to have access to and to suppress as evidence Dr. Bennett's statements and any evidence derived from those statements because Dr. Bennett was interrogated by government agents in a custodial setting without being afforded *Miranda* warnings and this interrogation occurred done despite counsel's objection to any questioning by the agents.  *See Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Any interview by government agents of an individual suspected of a crime has "coercive aspects to it." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam).

Those interrogations that occur while a suspect is in the custody of law enforcement "heighte[n] the risk" that statements obtained are not the product of the suspect's free choice. *Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

By its very nature, any custodial police interrogation entails "inherently compelling pressures." *Miranda*, 384 U.S., at 467, 86 S.Ct. 1602. The physical and psychological isolation of custodial interrogation can "undermine the

individual's will to resist and ... compel him to speak where he would not otherwise do so freely." Id.

Whether a suspect is "in custody" for Miranda purposes is an objective determination involving two discrete inquires: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383.

The government agents at the time of the interrogations, and now the courts afterwards, must "examine all of the circumstances surrounding the interrogation," *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293, including those circumstances that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave," Id., at 325, 114 S.Ct. 1526.

There is no question here that Dr. Bennett was not permitted to leave the building, in other words, he had no freedom to leave.

Recognizing that the inherently coercive nature of custodial interrogation "blurs the line between voluntary and involuntary statements," Dickerson, 530 U.S., at 435, 120 S.Ct. 2326, Miranda adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination.

Prior to questioning, a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against

him, and that he has a right to the presence of an attorney, either retained or

appointed." 384 U.S., at 444, 86 S.Ct. 1602; *see also Florida v. Powell*, 130 S.Ct.

1195, 1198, 175 L.Ed.2d 1009 (2010)

    In this case, Dr. Bennett was not advised of these rights and he had an

attorney who told an agent that he did not want his client interrogated; the agents

blithely disregarded both the requirement to advise Dr. Bennett and his counsel's

objection to questioning him at all.  Those guidelines established that the

admissibility in evidence of any statement given during custodial interrogation of

a suspect would depend on whether the police provided the suspect with four

warnings.

    If a suspect makes a statement during custodial interrogation, the burden is

on the Government to show, as a "prerequisit[e]" to the statement's admissibility

as evidence in the Government's case in chief, that the defendant "voluntarily,

knowingly and intelligently" waived his rights.  *Miranda*, 384 U.S., at 444, 475–

476, 86 S.Ct. 1602; *Dickerson*, 530 U.S., at 443–444, 120 S.Ct. 2326.

    The government can make no such showing in this case.

    Nor was there any waiver here – as Dr. Bennett was never apprised of his

rights.

    Miranda's requirements are "rigid," *see Fare v. Michael C.*, 439 U.S. 1310,

1314, 99 S.Ct. 3, 58 L.Ed.2d 19 (1978) (Rehnquist, J., in chambers), because

failure to comply prompts the suppression of even "trustworthy and highly

probative" statements that may be perfectly "voluntary under [a] traditional Fifth

Amendment analysis." *Fare v. Michael C.*, 442 U.S. 707, 718, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

**I. THE IMPETUS FOR THIS UNLAWFUL SEARCH WAS THE CONSTITUTIONALLY IMPERMISSIBLE PURPOSES OF:**
   **a. CHILLING DR. BENNETT'S FIRST AMENDMENT RIGHT TO ASSOCIATE WITH HIS PATIENTS, AND TO CARE FOR THEM, AND**
   **b. THE AGENTS' EFFORTS TO COERCE HIM IN VIOLATION OF HIS FIFTH AND SIXTH AMENDMENT RIGHTS.**

**A. The Right of Association.**

The right of association is within the ambit of the constitutional protections afforded by the First and Fourteenth Amendments. This right has been long and well established. *See NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163 (1958); *Bates v. Little Rock*, 361 U.S. 516 (1960); *Shelton v. Tucker*, 364 U.S. 479, 8 S.Ct. 247 (1960); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328 (1963).

Freedom to engage in an association for the advancement of beliefs and ideas and lawful conduct are an inseparable aspect of the liberty assured by the Due Process clause of the Fourteenth Amendment which embraces freedom of speech. There is also a right that one's associations be private. These rights are fundamental and are protected against heavy-handed frontal attack, and from being chilled or stifled. *Compare Bates v. Little Rock, supra*, 361, U.S., at 523, 80 S.Ct., at 416.

By its unceasing public campaign against the use of any opiates to remediate against acute and chronic pain, the government has shown a bias against

patients who receive such medication and physicians who administer this medication.

It does appear that the government's demand to uncover who the patients were was a constitutionally impermissible effort to restrain the freedom of patients to associate with a physician to treat these patients with a protocol that the government, knowing no better, and caring less, has criminalized. *Compare NAACP v. Alabama, supra*, 357 U.S., at462, 78 S.Ct., at 1171.

It is manifest that the government hoped, by its dragnet, and brute force to deny these associates the "breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328 (1963).

In this case, we are talking about more than an "association" or "relationship" surviving, we are talking about the patients themselves, collectively and individually "surviving" as their co-dependent relationship is as the sick dependent on the treatment by physicians that the government has consciously and actively chilled both more generally and in this specific investigation.

**B.  <u>The Right to remain silent free of coercion to speak.</u>**

The agents kept Dr. Bennett in custody while the search was in progress; in other words, he was not free to go, and was their captive, plainly "seized" in the Fourth Amendment sense.

During the execution of the search warrant, the Agents then violated Dr. Bennett's Fifth and Sixth Amendment rights by failing to give him *Miranda*

warnings, using coercive law enforcement tactics to compel him to assist in the search and the seizure of his patients' records in a police-dominated atmosphere.

The Fifth Amendment guarantees that, "[No] person shall be compelled to be a witness against himself." U.S. Constitution, Fifth Amendment.   The government compels and coerces a defendant to speak when officers fail to give Miranda warnings during a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). We have already reviewed the facts and law above.  But forcing Dr. Bennett to aid in the search and seizure during the execution of a search warrant also violates the Fifth Amendment. *Compare United States v. Trott*, 421 F. Supp. 550 (D. Del. 1976).

The Supreme Court has clearly stated: "[T]he constitutional privilege against self-incrimination ...is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him." (Emphasis added). *Bellis v. United States*, 417 U.S. 85, 88 (1974) (quoting *United States v. White*, 322 U.S. 694, 698 (1944)).

While Dr. Bennett had nothing to hide, he also had a right not to say anything at all.

**WHEREFORE,** for all of the foregoing reasons, and for such other reasons that may appear just and proper, we respectfully demand that this Court

(first), unseal the search warrant affidavit, and the government pleading demanding it be sealed;

(second), return the property seized,

(third), suppress the "evidence" that was seized,

(fourth) disclose to Movant *in toto* the statements the government coerced during the search when Dr. Bennett's person was seized, and then suppress those statements for the constitutionally impermissible manner they were obtained,

(fifth), schedule an evidentiary hearing to allow Movant to prove the facts asserted herein in support of this application; and

(sixth), such additional relief as this Court may deem fit and just including attorney's fees and costs for having to make these motions.

**JOHN BENNETT, M.D.**
**By Counsel**

**John P. Flannery, II (VSB # 22742)**(*pro hac vice*
*Campbell Flannery*
1602 Village Market Blvd., Suite 220
Leesburg Virginia 20175
Telephone: 703-771-8344
Facsimile: 703-777-1485
E-mail: jonflan@aol.com
Counsel for Movant John Bennett, M.D.

**Jeffrey S. Weiner, Esq., local counsel**
JEFFREY S. WEINER, P.A.
Two Datran Center
Suite 1910
9130 S. Dadeland Boulevard
Miami FL  33156
Telephone:  305-670-9919
Fax:  305-670-9299
E-mail: lawfirm@jeffweiner.com
Co-counsel for Movant John Bennett, M.D

# EXHIBIT A

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Gulfstream Pain Center<br>327 E. Hallandale Beach Blvd., Hallandale, FL 33009<br>(more fully described in Attachment A) | )<br>)<br>)<br>)<br>)<br>) | Case No.   11-6173-SNOW |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:

Gulfstream Pain Center, 327 E. Hallandale Beach Blvd., Hallandale, FL 33009, more fully described in Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

### See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before April 13, 2011
*(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Lurana S. Snow, or Duty US Magistrate Judge _____ .
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.
☐until, the facts justifying, the later specific date of _____

Date and time issued: 3/30/2011
                              3:20 PM

_Lurana S. Snow_
*Judge's signature*

City and state:   Fort Lauderdale, FL         LURANA S. SNOW, US MAGISTRATE JUDGE
                                                       *Printed name and title*

## ATTACHMENT A

The premises is described as a tan in color, stucco and concrete structure which faces South and is located near the cross streets of Hallandale Beach Boulevard and NE Fourth Street. It bears the address 327 E. Hallandale Beach Boulevard and is part of a plaza which includes one other business, an insurance agency. The business has two front doors and two rear doors and bears a sign which now identifies it as the Gulfstream Pain Center.



# ATTACHMENT B

All records, documents, and materials present on or within the premises to be searched, including in locked containers, in whatever form they are maintained, including handwritten and computer generated, and controlled substances which are fruits, evidence, and instrumentalities of the crimes in violation of Title 21, United States Code Sections 841 and 846, including

1.    Records regarding the acquisition, prescribing, dispensing and inventory of controlled substances, including appointment books; sign-in sheets; the seizure of surveillance cameras, related paraphernalia and surveillance videos; patient lists, patient files and notes; patient referrals or other treatment records; prescriptions; dispensing logs; order forms; receipts; theft and loss reports; shipping records; packing slips; accounting ledgers; logs; payment records or receipts; receipts relating to the sale of controlled substances from the in-house pharmacy; the treatment history and payments of patients;

2.    Records regarding the ownership, possession, control, or occupancy of the TARGET CLINIC and the premises searched, including incorporation records, business licenses, occupancy permits, utility and telephone bills, mail, rental or purchase agreements, and keys;

3.    Any and all currency, ledgers, invoices, receipts, accounting documents, bank statements and related records, bank passbooks and checks, credit card statements and receipts, money orders, wire transfers and transaction records, facsimile transmittals, letters of credit, bank money wrappers, tax returns and other tax records, safe deposit box or storage units keys, rental agreements and records, and other items evidencing the obtaining, secreting, transfer, investment and/or concealment of assets, and the obtaining secreting, transfer, concealment and/or expenditure of money by and on behalf of the TARGET CLINIC or Dr. Bennett;

4.    Any and all address and/or telephone books, Rolodex indices, correspondence and other papers or records reflecting the names, addresses, telephone or fax numbers of the owners, present and past patients, current and former employees, co-conspirators, financial institutions, and other individuals or businesses with whom a financial or business relationship exists, including manufacturers, wholesalers, or distributors of controlled substances, and financial institutions or services;

5.    Payroll, personnel files, correspondence and intra-office communications regarding Dr. Bennett, the owners and all other past and current employees showing identities, employment position, employment contracts, salary and benefits, status, history, and duties, including educational background, training, professional licenses, and time and attendance records;

6.    Computer hardware, consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.  Hardware includes any data-processing devices (such as cental processing units, computers, smart phones, memory facsimile machines and "schedulers"); internal and peripheral storage devices (such as disks, external hard drives, USB storage devices, optical storage devices, transistor-like binary devices, read\write CD and DVD devices, DVR devices and any and all storage devices); peripheral input/output devices(such as keyboards, printers, scanners, video display monitors, mouse devices, cameras); and related communication devices (such as modems, routers, cables, and connections, recording equipment, RAM or ROM unites);

as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks)1 ;

7.      Computer software, that is, digital information which can be interpreted by a computer and any of its related components to direct the way they work, as well as instruction manuals relating to the same.  Software is stored in electronic, magnetic, optical, or other digital form.  It commonly includes programs to run operating systems, applications (like word processing, networking, graphics, accounting, presentations or spreadsheet programs), utilities, compilers, interpreters, and communication programs.

8.      Surveillance equipment and recordings in whatever form maintained.

9.      As used within the above document, the term "records," "documents," and "materials," include all items of evidence in whatever form and by whatever means such records, documents, or materials, or their drafts may have been created or stored, including, any handmade form (such as writing, drawing, printing with any implement on any surface); any photographic form (including microfilm, microfiche, prints, slides, negatives, photographs, videotapes and similar media, and photocopies) and any mechanical form (such as printing or typing), and electric, electronic, or magnetic form (such as tape recordings, cassettes, compact disks), or any information on an electronic or magnetic storage device (such as compact or optical disks, DVDs, thumb, flash, or hard drives, smart cards, printer buffers, or electronic notebooks, as well as computer printouts).

---

1For any computer hard drive, computer software or electronic media that is subject to this search warrant, or that might contain things otherwise covered by this search warrant:  (A) evidence of user attribution showing who used or was the owner at the time the things described in this search warrant were created, edited or deleted, such as logs, registry entries, saved user names and passwords, documents and browsing history; (B) passwords, encryption keys, and other access devices that may be necessary to gain access; and (C) documentation and manuals that may be necessary to gain access or to conduct a forensic examination.

AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|
|           I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*